SEALED

ORDERED UNSEALED on 09/11/2026 s/ melindajw

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KHATERA HASHIMI,<br>Defendant. | Case No.: 26mj5188<br>**COMPLAINT FOR VIOLATION OF**<br>Title 18, U.S.C., Sec. 1343 – Wire Fraud; Title 18, U.S.C., Sec. 1957 Money Laundering; Title 18, U.S.C., Secs. 981(a)(1)(A), (C), 982(a)(1), (2) and Title 28, U.S.C., Sec. 2461(c) and Title 21, U.S.C., Sec. 853 - Criminal Forfeiture<br>**UNDER SEAL** |

The undersigned complainant being duly sworn states:

At all times relevant to this Complaint:

**INTRODUCTION**

1. The United States Department of Health and Human Services ("HHS") provided federal funding to states, including the State of California, to help low-income families pay for childcare expenses.

2. In California, four programs provided subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP").

3. In the Southern District of California, the County of San Diego administered "Stage 1" subsidies, and two community organizations,

Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administered subsidies through the C2AP, C3AP, and CAPP.

4. Generally, if CDA or YMCA determined that a family was eligible to receive subsidized childcare services and the family's selected childcare provider (i) registered with CDA or YMCA, (ii) had an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and (iii) submitted monthly attendance records documenting the childcare they provided, CDA and YMCA paid subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

5. Monthly attendance record forms had "self-certification" and signature sections for both the childcare provider and the parent, both of which began, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA did not issue payment to registered childcare providers.

6. CDA and YMCA used a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms included the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month.

7. Childcare providers could submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application. All submissions resulted in a copy of the completed attendance record being transmitted, over interstate wire communications, to the third-party software company's servers in Oregon.

8. California regulations stated in part, "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

9. Defendant KHATERA HASHIMI, a resident of the Southern District of California, operated "HASHIMI, KHATERA FAMILY CHILD CARE" at an apartment on Redwood Avenue in El Cajon, California, within the Southern District of California. The license, effective February 11, 2019, authorized HASHIMI to provide care for up to eight children at the facility on Redwood Avenue.

10. Following an application for a "location change" and "capacity change," Defendant HASHIMI received a license from CDSS to operate "HASHIMI, KHATERA FAMILY CHILD CARE" at an address on Hay Court in El Cajon, California, within the Southern District of California. The license, effective October 26, 2022, authorized HASHIMI to provide care for up to 14 children at the facility on Hay Court.

**Counts 1-4**

**(Wire Fraud)**

**[18 U.S.C. § 1343]**

11. Paragraphs 1 to 10 are re-alleged and incorporated herein.

12. Beginning on a date unknown, but no later than in or about February 2019, and continuing through at least July 1, 2026, within the Southern District of California and elsewhere, defendant KHATERA HASHIMI, knowingly and with the intent to defraud, devised, participated in, and executed a material scheme and artifice to defraud and to obtain

money and property by means of materially false and fraudulent pretenses, representations, and promises, and intentional concealment and omission of material facts.

**Manner and Means**

13. The fraudulent scheme and artifice to defraud was operated and was carried out, and to be carried out, in substance, as follows:

14. Defendant HASHIMI applied for and received from CDSS licenses to operate childcare facilities in the Southern District of California.

15. After obtaining licenses from CDSS, defendant HASHIMI registered with CDA and YMCA as the childcare provider for families that received subsidized childcare services.

16. Defendant HASHIMI, using the third-party software, accessed and printed blank monthly attendance records for each child HASHIMI was registered with CDA or YMCA as the childcare provider.

17. Defendant HASHIMI submitted to CDA and YMCA completed attendance records for each child HASHIMI had purportedly provided childcare to in the preceding month, and certified under penalty of perjury the accuracy of the dates and times she provided care to a child.

18. Defendant HASHIMI, to obtain payment from CDA and YMCA, knowingly submitted and caused to be submitted attendance records containing materially false and fraudulent statements, specifically the dates and times she purportedly provided childcare to the children identified in the attendance records, and her false certification under penalty of perjury that that the information in the attendance records was true and correct.

19. Defendant HASHIMI submitted her attendance records to CDA and YMCA, both of which processed the records through the same third-party software and thereby caused interstate wire communications, specifically

the transmittal of the attendance records to the third-party software company's server in Oregon.

20. CDA and YMCA relied on defendant HASHIMI's false and fraudulent statements in the attendance records and remitted payment to HASHIMI based on her materially false and fraudulent representations, promises, and intentional concealment and omission of material facts. In doing so, HASHIMI obtained funds from the United States Government that were intended to pay for childcare actually provided to low-income families.

**Use of the Wires**

21. On or about the dates set forth below, within the Southern District of California and elsewhere, defendant KHATERA HASHIMI, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds as more particularly described below:

| Count | Approximate Date | Interstate Wire |
|---|---|---|
| 1 | June 3, 2026 | Electronic submission of May 2026 Attendance Record for Child 1 |
| 2 | June 3, 2026 | Electronic submission of May 2026 Attendance Record for Child 2 |
| 3 | July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 1 |
| 4 | July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 2 |

All in violation of Title 18, United States Code, Section 1343.

///

///

**Count 5**

**(Money Laundering)**

**[18 U.S.C. § 1957]**

22. Paragraphs 1 to 21 are re-alleged and incorporated herein.

23. On or about August 10, 2022, within the Southern District of California, defendant KHATERA HASHIMI did knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00 and which was derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, to wit: the wire transfer of $40,599.14 from Navy Federal Credit Union account -5516 to CommerceWest Bank account -4921, all in violation of Title 18, United States Code, Section 1957.

**FORFEITURE ALLEGATIONS**

The allegations set forth in Counts 1 through 5 of this Complaint are realleged and incorporated as a part hereof for purposes of seeking forfeiture of property pursuant to Title 18, United States Code, Sections 981(a)(1)(A)&(C), 982(a)(1), and 982(b), and Title 28, United States Code, Section 2461(c).

Upon conviction of one and more of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 1 through 4 of this Complaint, defendant KHATERA HASHIMI shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c) and Title 21, United States Code, Section 853, all property, real and personal, which constitutes or is derived from proceeds of the offenses and all property traceable to such property, and all facilitating property.

Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 as set forth in Count 5 defendant KHATERA HASHIMI shall forfeit to the United States all property involved in the offense pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1).

If any of the forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

The complainant states that this complaint is based on the attached probable cause statement, which is incorporated herein by reference.

________________________________
Ryan Roberson, Special Agent
IRS Criminal Investigation

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 3rd day of September 2026.

________________________________
HON. DAVID D LESHNER
United States Magistrate Judge

STATEMENT OF PROBABLE CAUSE

**A. Training and Experience**

1. I am a Special Agent with the Internal Revenue Service – Criminal Investigation ("IRS-CI"), and have been so employed since October of 2016. As a Special Agent, I am assigned to investigate financial crimes where violations of the Internal Revenue Code and related offenses have occurred, including the investigation of money laundering offenses under Title 18, United States Code, Sections 1956 and 1957 and those statutes which are contained in the Bank Secrecy Act as set for in Title 31 of the United States Code. I have personally conducted investigations of alleged criminal violations of the federal statutes, among other, related to public and foreign corruption, bribery, kickbacks, honest services mail/wire fraud, international money laundering, international emergency economic powers act, tax crimes, currency reporting, narcotics and counterintelligence. I have testified in federal court on several occasions, including as the government's summary witness in a complex wire fraud case involving over $100 million of misappropriated funds, which were traced by me and my investigative team. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities and criminal proceeds from detection by law enforcement authorities. In addition, during the time I have been employed as a Special Agent, I have been assigned to investigations involving multi-agency jurisdictions. These investigations regularly involved the tracing of currency and other proceeds flowing from illegal enterprises to assets and other monetary instruments. Through this involvement, I have assisted domestically with

///

the forfeiture of currency, bank accounts, and other assets, as well as the tracing of bank accounts and assets to seize internationally.

2. All dates, times, and amounts herein are approximate.

**B. Background of Federally Subsidized Childcare Programs**

3. The United States Department of Health & Human Services provides federal funding to states to help low-income families pay for childcare expenses.

4. In California, there are four programs that provide subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP"). In San Diego, the County of San Diego administers "Stage 1" subsidies, and two community organizations, Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administer subsidies through the C2AP, C3AP, and CAPP.

5. Generally, if CDA or YMCA determines that a family is eligible to receive subsidized childcare services and their selected childcare provider registers with CDA or YMCA, has an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and submits monthly attendance records documenting the childcare they provided, CDA and YMCA pay subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

6. The monthly attendance record forms have "self-certification" and signature sections for both the childcare provider and the parent, both of which begin "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]"

///

Without a completed and signed attendance record, CDA and YMCA do not issue payment to registered childcare providers.

7. CDA and YMCA both use a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms include the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month. A childcare provider can submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application; all submissions result in a copy of the completed attendance record being transmitted to the third-party software company's servers in Oregon.

8. California regulations state in part: "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

**C. Investigation Background**

9. Since February 2026, IRS-CI and Homeland Security Investigations ("HSI") have been investigating a scheme in which individuals in the Southern District of California receive licenses to operate childcare facilities, register as childcare providers to families approved for subsidized childcare, and routinely submit materially false and fraudulent monthly attendance records to obtain subsidy payments. The attendance records are false and fraudulent in that they claim the individual provided care to children on dates and times that no actual childcare could have been provided, either because

there were no children at the facility or the licensed provider was not at the facility--and in some instances was not even in the United States at the time of the purported childcare. CDA and YMCA rely on the accuracy of the attendance records when remitting payment to providers for the childcare they purportedly provided to low-income families.

10. Through the investigation, agents identified Defendant KHATERA HASHIMI as an individual who purported to provide childcare services in San Diego, California, which is in the Southern District of California, since at least 2022.

11. HASHIMI first received a license from CDSS to operate "HASHIMI, KHATERA FAMILY CHILD CARE" at an apartment on Redwood Avenue in El Cajon, California effective February 11, 2019. The license authorized HASHIMI to provide care to up to eight children at the facility on Redwood Avenue.

12. Defendant HASHIMI submitted to CDSS applications for a "location change" and "capacity change," and received a license from CDSS to operate "HASHIMI, KHATERA FAMILY CHILD CARE" at an address on Hay Court in El Cajon, California effective October 26, 2022. The license authorized HASHIMI to provide care for up to 14 children at the facility on Hay Court.

13. On July 18, 2023, defendant HASHIMI signed a form submitted to CDA acknowledging in part "I understand when I sign anything under penalty of perjury I am declaring the information I have provided or statements I am making are factual, true and correct. Making false statements under penalty of perjury may result in prosecution and punishment under State and/or Federal laws."

14. Since November 2019, HASHIMI has received over $950,000 in payments from YMCA and CDA.

15. Based on my training and experience and knowledge of this investigation, I believe HASHIMI is obtaining these funds by routinely submitting materially false and fraudulent attendance record forms that falsely claim she provided childcare to multiple children on dates when no children were at the facility and, in some instances, when HASHIMI herself was not even at the facility.

**D. HASHIMI Falsely Certified Attendance Records**

16. Based on my investigation, I believe HASHIMI falsely certified attendance records for May and June 2026.

17. On or about June 3, 2026, HASHIMI submitted at least 10 attendance records to CDA, and at least 12 attendance records to YMCA. In total, HASHIMI claimed under penalty of perjury to have provided childcare to at least 22 children in May 2026. Notably, HASHIMI's attendance records claimed that she cared for multiple children under the age of five, including at least four children under the age of two when the care took place. HASHIMI's attendance records claimed that she cared for up to 22 children—including Child 1 and Child 2—every weekday of May 2026, except for May 25, beginning as early as 8:00 a.m. and ending as late as 8:55 p.m.

18. On or around July 1, 2026, HASHIMI submitted at least 10 attendance records to CDA and at least 13 attendance records to YMCA. HASHIMI claimed under penalty of perjury to have provided childcare to approximately 23 children in June 2026. HASHIMI's attendance records claimed that she cared for multiple children under the age of five, including at least four children under the age of two when the care took place. HASHIMI's attendance records claimed that she cared for up to 23 children—including Child 1 and Child 2—every weekday of June 2026, covering time ranging from as early as 8:00 a.m. to as late as 8:52 p.m.

19. Each of the attendance records defendant HASHIMI submitted for the months of May 2026 and June 2026 listed "HASHIMI, KHATERA" or "KHATERA HASHIMI" as the provider and contained a dated signature under the "Provider Self-Certification" stating in part, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" The only active childcare license defendant HASHIMI had during those months was for "Hashimi, Khatera Family Child Care" on Hay Court in El Cajon.

20. HASHIMI submitted the attendance records for May and June 2026 to CDA and YMCA in the Southern District of California, and she caused the following interstate wires when the attendance records were transmitted to the third-party software company's server in Oregon:

| Approximate Date | Interstate Wire |
|---|---|
| June 3, 2026 | Electronic submission of May 2026 Attendance Record for Child 1 |
| June 3, 2026 | Electronic submission of May 2026 Attendance Record for Child 2 |
| July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 1 |
| July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 2 |

**E. Stationary Remote Surveillance of HASHIMI's Facility**

21. The investigation team conducted stationary remote surveillance of HASHIMI's licensed facility on Hay Court between approximately May 11, 2026, and June 17, 2026.[1] Of the 36 complete days captured in the surveillance recordings (May 12 through June 16), the

[1] The surveillance recordings do not include every minute of the surveillance period; rather, the stationary remote surveillance recorded only for a duration after detecting motion in the frame, including people or moving vehicles on the sidewalk, street, or driveway adjacent to the facility.

investigative team did not observe more than three children entering defendant HASHIMI's facility on any day.[2]

22. Two children were regularly observed arriving and departing at the facility with HASHIMI on most days, and appeared to stay overnight at the facility most nights. In addition to these patterns observed in the surveillance recordings, I discovered that certain CDSS reports are available through open-source research, including a facility evaluation report summarizing a CDSS visit to HASHIMI's facility on July 17, 2025. Notably, that report states in part that during the inspection there "were no day care children" present, but "two of the licensee's own children under ten years of age" were present. Based on the surveillance recordings and that CDSS facility evaluation report, I believe the two children regularly observed in the surveillance recordings are the children of defendant HASHIMI, and not 22 to 23 children that HASHIMI claimed to provide childcare to in the attendance records she submitted to CDA and YMCA.

23. The table below documents the number of children claimed on the attendance sheet and the number of children observed via electronic surveillance, including the two that I believe to be HASHIMI's children:

///

///

///

///

///

[2] Based on the surveillance recordings, multiple individuals including what appear to be a family, arrived at the facility on May 14, 2026, at 6:44 p.m.; I believe these individuals departed the facility later in the night. Additionally, based on the surveillance recordings, several families arrived at the facility on May 29, 2026, after 3:04 p.m.; I believe these families departed the facility later in the night.

| Date [2026] | Children HASHIMI Claimed on Attendance Records | Children Observed at HASHIMI's Facility in Surveillance Recordings |
|---|---|---|
| May 12 | 22 | 2 |
| May 13 | 22 | 2 |
| May 14 | 22 | 2 |
| May 15 | 22 | 3 |
| May 16 | 0 | 2 |
| May 17 | 0 | 2 |
| May 18 | 22 | 2 |
| May 19 | 22 | 2 |
| May 20 | 22 | 2 |
| May 21 | 21 | 2 |
| May 22 | 21 | 3 |
| May 23 | 0 | 3 |
| May 24 | 0 | 2 |
| May 25 | 0 | 3 |
| May 26 | 22 | 3 |
| May 27 | 19 | 2 |
| May 28 | 22 | 0 |
| May 29 | 22 | 2 |
| May 30 | 0 | 1 |
| May 31 | 0 | 2 |
| June 1 | 23 | 2 |
| June 2 | 23 | 2 |
| June 3 | 23 | 2 |
| June 4 | 23 | 0 |
| June 5 | 23 | 2 |
| June 6 | 0 | 2 |
| June 7 | 0 | 0 |
| June 8 | 23 | 2 |
| June 9 | 23 | 2 |
| June 10 | 23 | 2 |
| June 11 | 23 | 2 |
| June 12 | 23 | 2 |
| June 13 | 0 | 2 |
| June 14 | 0 | 0 |
| June 15 | 23 | 2 |
| June 16 | 23 | 2 |

24. Despite HASHIMI's attendance records claiming she provided childcare for approximately 22 children on most weekdays in May 2026 and 23 children on most weekdays in June 2026, the surveillance recordings,

with two exceptions when families entered HASHIMI's residence together, did not show more than 3 children entering or exiting the facility on the same day between May 12, 2026, and June 16, 2026.

25. Similarly, the surveillance recordings did not show a child that appeared to be under the age of two years old arriving or departing from HASHIMI's facility between May 12, 2026, and June 16, 2026. In contrast to the surveillance recordings, HASHIMI claimed in the attendance records to have cared for a 7-month-old baby and 3 other children under the age of two, nearly every weekday in May and June 2026.

26. In addition to HASHIMI claiming in attendance records to have cared for more children than the number of children observed entering the facility in the surveillance recordings, the times that HASHIMI claimed to have provided care in the attendance records are inconsistent with the surveillance recordings. For example, HASHIMI claimed to provide care nearly every weekday between May 12 and June 16, with care on those days purportedly beginning between 8:00 a.m. and 8:20 a.m.; however, the surveillance recordings show that, when children were observed entering the facility, the first two children entering the facility typically arrived in the early afternoon.

**F. CDSS Visit to HASHIMI'S Facility**

27. During my investigation, I discovered that certain CDSS reports are available through open-source research. According to publicly available reports, a CDSS licensing program analyst conducted an unannounced visit to HASHIMI's facility on Hay Court on July 17, 2025, and an unannounced plan of correction visit on September 5, 2025.

28. According to the report summarizing the unannounced visit on July 17, 2025, the CDSS analyst arrived at 9:45 a.m. and completed the

inspection at 1:20 p.m. According to the report, HASHIMI, her husband, and "two of the licensee's own children under ten years of age" were present, but there "were no day care children" at the facility during the inspection.

29. Despite no children being present during the CDSS inspection on July 17, 2025, HASHIMI subsequently submitted attendance records to YMCA claiming to have provided childcare to children on July 17, 2025, specifically to seven children beginning at 1:00 p.m. According to the report summarizing the CDSS inspection, there were no children present during the inspection, which began at 9:45 a.m. and ended at 1:20 p.m. Based on the attendance records that HASHIMI submitted, seven children should have been present at the facility during the inspection on July 17, 2025.

30. According to the report summarizing the unannounced visit on September 5, 2025, the CDSS analyst arrived at HASHIMI's facility at 11:15 a.m. and completed the inspection at the facility at 12:00 p.m. According to the report, "No child care children were preset during" the inspection.

31. Despite no children being present during the CDSS inspection on September 5, 2025, HASHIMI subsequently submitted attendance records to YMCA claiming to have provided childcare to 12 different children on September 5, 2025, specifically: two children from 7:20 a.m. to 11:45 a.m.; two children from 7:20 a.m. to 7:56 a.m.; and three children from 8:30 a.m. to 12:32 p.m.; and five children from 5:10 p.m. to 8:41 p.m. Based on the attendance records that HASHIMI submitted, five children should have been present at the facility during the inspection on September 5, 2025.

///

32. Based on my training and experience and knowledge of this investigation, I believe HASHIMI falsely submitted attendance records claiming she provided childcare to children that were not actually present at the facility in July 2025 and September 2025.

**G. Payments to HASHIMI**

33. After submitting the attendance records for childcare provided in May 2026, HASHIMI was issued payments from YMCA that totaled to $6,170.16 on June 18, 2026, $5,248.34 on June 23, 2026, and $781.87 on July 23, 2026.

34. After submitting the attendance records for childcare provided in May 2026, HASHIMI was issued payment from CDA that totaled to $8,611.34 on June 17, 2026.

35. After submitting the attendance records for childcare provided in June 2026, HASHIMI was issued payments from YMCA that totaled to $13,245.17 on July 14, 2026, and $933.83 on July 16, 2026.

36. After submitting the attendance records for childcare provided in June 2026, HASHIMI was issued payment from CDA that totaled to $8,154.09 on or about July 15, 2026, and $970.01 on July 16, 2026.

**J. HASHIMI's Wire Transfer of Proceeds on August 10, 2022**

37. On August 10, 2022, HASHIMI, the sole signatory and owner of Navy Federal Credit Union account -5516, wired $40,599.14 from Navy Federal Credit Union account -5516 to CommerceWest Bank account -4921. I conducted Lower Intermediate Balance Rule (LIBR) tracing[3] to determine what amount of the funds used in HASHIMI's money laundering transaction was attributed to the income that HASHIMI made as part of her wire fraud.

[3] LIBR tracing is a forensic accounting method used to track and identify the ownership of funds inside a mixed or commingled bank account. "Dirty funds" are only considered spent or withdrawn when the "clean funds" in the account drop completely to zero.

The income attributed to HASHIMI's scheme is considered "dirty funds," and all HASHIMI's other income is considered "clean funds." Under LIBR, the assumption is that a person spends their clean funds first, and only after the clean funds are exhausted do they begin to spend their dirty funds.

38. After conducting LIBR tracing, HASHIMI's money laundering transactions were identified as follows: the wire from Navy Federal Credit Union account -5516 to CommerceWest Bank account -4921 for $40,599.14 on August 10, 2022, was comprised of $38,599.14 of dirty funds and $2,000.00 of clean funds.

**K. Conclusion**

39. Based on my training and experience, I believe defendant HASHIMI executed a wire fraud scheme from a date unknown but no later than February 2019 and continuing through at least July 1, 2026, in violation of 18 U.S.C. § 1343 and knowingly engaged in a monetary transaction with criminally derived property of a value greater than $10,000.00 when she made a wire transfer of $40,599.14.